IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LUCRETIA BURKARD,
        Plaintiff,

                                           CV 09-1073-PK

                                         FINDINGS AND
v.                                   RECOMMENDATION

MICHAEL J. ASTRUE,
Commissioner of Social Security,
                  Defendant.
_____

PAPAK, Magistrate Judge:

       Plaintiff Lucretia Burkard filed this action September 9, 2009, seeking judicial review of

a final decision of the Commissioner of Social Security finding her not disabled and not entitled

to disability insurance benefits ("DIB") under Title II of the Social Security Act (the "Act"). This

court has jurisdiction over Burkard's action pursuant to 42 U.S.C. §§ 405(g).

       Burkard argues that the Commissioner failed properly to assess her residual functional

capacity after completing step three of the five-step sequential process for analyzing a Social

Page 1 - FINDINGS AND RECOMMENDATION

Security claimant's entitlement to benefits and that the Commissioner improperly relied on testimony by a vocational expert based on a hypothetical unsupported by the record. I have considered all of the parties' briefs and all of the evidence in the administrative record. For the reasons set forth below, the Commissioner's decision should be reversed and remanded for award of benefits.

## DISABILITY ANALYSIS FRAMEWORK

To establish disability within the meaning of the Social Security Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner has established a five-step sequential process for determining whether a claimant has made the requisite demonstration. *See Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); *see also* 20 C.F.R. §§ 404.1520(a)(4). At the first four steps of the process, the burden of proof is on the claimant; only at the fifth and final step does the burden of proof shift to the Commissioner. *See Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

At the first step, the Administrative Law Judge considers the claimant's work activity, if any. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i). If the ALJ finds that the claimant is engaged in substantial gainful activity, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i), 404.1520(b). Otherwise, the evaluation will proceed to the second step.

At the second step, the ALJ considers the medical severity of the claimant's impairments. *See Bowen*, 482 U.S. at 140-141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii). An impairment is

"severe" if it significantly limits the claimant's ability to perform basic work activities and is expected to persist for a period of twelve months or longer. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(c). The ability to perform basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b); *see also Bowen*, 482 U.S. at 141. If the ALJ finds that the claimant's impairments are not severe or do not meet the duration requirement, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c).

If the claimant's impairments are severe, the evaluation will proceed to the third step, at which the ALJ determines whether the claimant's impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d). If the claimant's impairments are equivalent to one of the impairments enumerated in 20 C.F.R. § 404, subpt. P, app. 1, the claimant will conclusively be found disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d).

If the claimant's impairments are not equivalent to one of the enumerated impairments, the ALJ is required to assess the claimant's residual functional capacity ("RFC"), based on all the relevant medical and other evidence in the claimant's case record. *See* 20 C.F.R. §§ 404.1520(e). The RFC is an estimate of the claimant's capacity to perform sustained, work-related, physical and mental activities on a regular and continuing basis,[1] despite the limitations imposed by the claimant's impairments. *See* 20 C.F.R. §§ 404.1545(a); *see also* S.S.R. No. 96-8p, 1996 SSR

---

[1] "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." S.S.R. No. 96-8p, 1996 SSR LEXIS 5.

LEXIS 5.

At the fourth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's past relevant work.  *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iv).  If, in light of the claimant's RFC, the ALJ determines that the claimant can still perform his or her past relevant work, the claimant will be found not disabled.  *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f).  In the event the claimant is no longer capable of performing his or her past relevant work, the evaluation will proceed to the fifth and final step, at which the burden of proof is, for the first time, on the Commissioner.

At the fifth step of the evaluation process, some individuals limited by physical impairments to sedentary or light work must be found disabled, depending on their age and vocational education level.  20 C.F.R. § 404, Subpt. P, App. 2.  The so-called "grids" contained in Tables 1 and 2 of Appendix 2 to Subpart P of Section 404 set forth the criteria for determining whether such a nondiscretionary finding must be made.  In the event the grids do not mandate a finding of "disabled," the ALJ considers the RFC in relation to the claimant's age, education, and work experience to determine whether the claimant can perform any jobs that exist in significant numbers in the national economy.  *See Bowen*, 482 U.S. at 142;  *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c).  If the Commissioner meets his burden to demonstrate that the claimant is capable of performing jobs existing in significant numbers in the national economy, the claimant is conclusively found not to be disabled.  *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566.  A claimant will be found entitled to benefits if the Commissioner fails to meet his burden at the fifth step.  *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g).

## LEGAL STANDARD

A reviewing court must affirm an Administrative Law Judge's decision if the ALJ applied proper legal standards and his or her findings are supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g); *see also Batson v. Comm'r for Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). "'Substantial evidence' means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007), *citing Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).

The court must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Id.*, *citing Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The court may not substitute its judgment for that of the Commissioner. *See id.*, *citing Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006). If the ALJ's interpretation of the evidence is rational, it is immaterial that the evidence may be "susceptible [of] more than one rational interpretation." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989), *citing Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984).

## BACKGROUND

Plaintiff Lucretia Burkard was born on October 22, 1957. Tr. 105. She graduated from high school and attended two years of community college. Tr. 31-32. In 2002, Burkard was forced to quit her full-time teaching position at a private Christian school, where she had worked for over a decade, because of pain from moving metal chairs, the stress of keeping up with work, and the effects of her multiple medications. Tr. 46-47, 56. Burkard then took a caretaking job,

which ended after less than a month because she had difficulty carrying her client's groceries and

did not feel comfortable drive her client's car.  Tr. 48.

On June 26, 2006, Burkard filed an application for Title II disability insurance benefits,

Tr. 105-109, alleging a disability onset date of February 28, 2002.  Tr. 118.   Burkard described

her disabling medical conditions as follows:  "I HAVE CHRONIC PAIN.  EACH DAY I HAVE

DIFFERENT THINGS WRONG WITH ME.  I HAVE INNER EAR DAMAGE THAT

CAUSES ME TO BE DIZZY.  CHRONIC DEPRESSION SINCE 1990 I CAN'T KICK IT."  Tr.

118.  She asserted that these conditions first bothered her in June 1990.  *Id.*  Burkard continued to

work after her conditions first bothered her, but ultimately stopped working on April 28, 2002

because "I COULD NO LONGER WORK DUE TO MY DISABILITY.  I COULD NO

LONGER DRIVE WITH MY DIZZINESS."  *Id.*  Burkard's disability claim was denied initially

on August 10, 2006, Tr. 69, and denied on reconsideration on January 17, 2007.  Tr. 70.  On

March 19, 2007, Burkard requested a hearing, Tr. 85, and a hearing was held on November 3,

2008.  Tr. 26-68.  On January 8, 2009, ALJ John Madden, Jr. issued a decision finding Burkard

not disabled.  Tr. 8-25.  Burkard requested Appeals Council review of the ALJ's decision, but

that request was denied.  Tr. 1-4.  Burkard initiated this suit on September 9, 2009.

## I.    **Medical History**

Burkard's medical history indicates that she sought medical attention for fibromyalgia

since at least 1996 and depression since at least 1999 and struggled with managing chronic pain

and mental health symptoms since then.  On September 24, 1996, Burkard visited Dr. Atul

Deodhar of the Oregon Health Sciences University rheumatology clinic, on a referral from her

primary care doctor in Salem, Oregon, for investigation of "complaints suggestive of

fibromyalgia."[2]  Tr. 494.  Upon physical examination, Dr. Deodhar found that Burkard had "17

out of 18 trigger points of fibromyalgia," which led Dr. Deodhar to conclude that Burkard

suffered from fibromyalgia.  *Id.*  Dr. Deodhar saw Burkard a month later, on October 29, 1996,

after Burkard reported worsening aches and pains following a hysterectomy.  Tr. 493.  Dr.

Deodhar's examination revealed that Burkard "had all the trigger points of fibromyalgia and was

especially tender around her shoulder girdle and neck."  *Id.*

On August 5, 1999, Burkard sought treatment from Karen Grisham, a psychiatric mental

health nurse practitioner.  Tr. 295.  Grisham noted that Burkard had several physical problems,

including "[f]ibromyalgia since age 24," and diagnosed Burkard with major depression.  *Id.*

Grisham reported that Burkard had experienced anxiety and depression symptoms intermittently

since about age 18 and suffered panic attacks once or twice per week.  Tr. 296.  Over the next

several months, Grisham noted that Burkard's depression was unstable, Tr. 293,  that her panic

attacks had increased in frequency, Tr. 292, and that she had experienced a flare up in

fibromyalgia pain, including swelling in her shoulders.  Tr. 293.  Grisham continued to treat

Burkard for anxiety, stress, depression, and social difficulties through the middle of 2000.  Tr.

286-89, 290.

Burkard also visited Dr. John Rex from July 1999 through May 2001, who treated her for

pain as well as other conditions.  On September 20, 2000, Dr. Rex noted elevated blood sugar

and suggested "diabetic education," indicating that Burkard had diabetes.  Tr. 211.  In May 2001,

Burkard began physical therapy for her neck, back, and ankle pain.  Burkard's physical therapist

---

[2]The records from Burkard's visit with Dr. Deodhar were not in the administrative record
before the ALJ, but were introduced later to the Appeals Council.  The Appeals Council
nonetheless denied review.

noted fibromyalgia as one feature of her cervical spine condition.  Tr. 262.   Also in May 2001,

Dr. Rex noted Burkard was having neck and back pain and daily headaches.  Tr. 205.

Burkard had multiple treatments for ankle rehabilitation and sacroiliac, left hip, neck, and

lower back pain through October 2001.  Tr. 243-46, 249-51, 254, 256, 260.  On December 11,

2001, physical therapist Eileen Holt noted that Burkard's low back pain had improved with

treatment, but discharged Burkard because Burkard had not sought treatment after becoming

discouraged with her inability to increase her activity without worsening her mid–thoracic pain.

Tr. 243.

On February 28, 2002, Dr. Sean Shim of the Salem Clinic examined Burkard, noting that

she had type II diabetes, jaw pain, posterior neck pain, and depression.

In June 2002 Burkard was evaluated by nurse practitioner Karen Grisham, who diagnosed

her with Bipolar Disorder II, with a GAF score of 30-50 over the past year.   Tr. 283-284.

Grisham noted that Burkard was having continued difficulty with depression, severe anxiety, and

insomnia.  Tr. 282.  In July 2002 Burkard continued suffering panic attacks, had trouble leaving

the house and had crying episodes.  Tr. 282.

On May 7, 2002, Dr. Shim treated Burkard for abdominal cramping, hip pain, and right

elbow pain.  Tr. 318.  Dr. Shim noted that "the patient has fibromyalgia . . . and is chronically

tired and has had significant hip pain as well."  *Id.*  Dr. Shim stated that "[t]he patient is quite

disabled at this time." *Id.*  Upon testing, Dr. Shim found that extension of Burkard's right wrist

against resistence caused pain and that Burkard's grip strength was slightly diminished due to

pain. *Id.*

On September 18, 2002, Burkard was in a motor vehicle accident where she was rear-

Page 8 - FINDINGS AND RECOMMENDATION

ended by a truck.  Tr. 316.  Following the accident, on November 4, 2002,  Burkard was treated

again by Dr. Sean Shim and reported pain in her neck, right trapezius and rhomboid, and right

upper extremities.  *Id.*   Burkard also reported a worsening in her right elbow pain, which

predated the accident, and spasms in her upper right and middle back.  *Id.*  Dr. Shim prescribed

twice-weekly physical therapy for fibromyalgia and bursitis and encouraged another doctor, Dr.

Zirschky, to prescribe pain medication for Burkard.  *Id.*

        Although the physical therapy improved Burkard's bursitis pain, she still complained of

neck and upper back pain in a follow-up visit with Dr. Shim on January 13, 2003.  Tr. 310.  Dr.

Shim started Burkard on Vicodin because "the patient essentially cannot function without

adequate pain medication," and recommended Burkard consult with Dr. French for chronic pain

management.  *Id.*  At Dr. French's recommendation, Dr. Shim prescribed methadone for

Burkard.  Tr. 309.  After a follow-up visit on March 25, 2003, Dr. Shim continued Burkard on

physical therapy and increased her methadone dose.  *Id.*  Meanwhile, Burkard continued

treatment with Karen Grisham for depression, bipolar symptoms, and panic attacks.  Tr. 274-279.

        On April 7, 2003, Dr. Shim observed that Burkard's pain was becoming chronic and that

it was difficult to separate the pain caused by Burkard's underlying fibromyalgia from the pain

caused by her motor vehicle accident.  Tr 308.  Consequently, Dr. Shim increased Burkard's

methadone dose again, for the purpose of "pain control."  *Id.*  Two weeks later, in a follow-up

visit for fibromyalgia, Dr. Shim again increased Burkard's methadone dose, because she was

requiring two tablets of Vicodin and two tablets of Soma per day.  Tr. 307.  Four weeks later, on

May 19, 2003, Dr. Shim noted that, although Burkard "is still feeling like she needs to take just a

bit more [methadone] to get better pain control," Burkard had been feeling "much better" at the

current dose.  Tr. 307.   Nevertheless, Dr. Shim increased Burkhard's methadone dosage again, but also referred Burkard to Dr. French "because the speed of the escalation of the methadone dose is rather rapid for my comfort." Tr. 306.  Additionally, since Burkard's anxiety symptoms were being controlled by Ativan, Dr. Shim discontinued Burkard's prescription for Soma, but also asked Burkard to see nurse practitioner Karen Grisham for help managing her anxiety.  *Id.*

On June 20, 2003, in another follow-up visit for fibromyalgia, Dr. Shim examined Burkard and found that "palpation of trigger points are mostly tender in the mid-trapezius region but they are not as tender as before." Tr. 306.  He also noted that Dr. French had reduced Burkard's methadone somewhat and that Burkard had actually requested a further reduction in her methadone dosing because "her pain control is quite fine." *Id.*  Due to the current methadone dosing of 10 mg, four times per day, Dr. Shim noted that Burkard no longer need to see Dr. French for pain management.  *Id.*  Six months later, however, Burkard's chronic pain had worsened.  On December 23, 2003, Dr. Shim reported that despite taking methadone, Burkard "is still having tremendous muscle pain." Tr. 303.  He noted that "[t]he patient not only has pain in her trigger points, but anywhere she touches is sore." *Id.*  Burkard expressed an interest in seeing Dr. French for pain management and Burkard reported that the current dosage of methadone was insufficient to control her pain.  *Id.*  Consequently, Dr. Shim prescribed Vicodin for "break through pain" and referred Burkard again to Dr. French for a fibromyalgia consultation.  Tr. 303. Burkard, however, apparently never visited Dr. French again, and remained on a 10 mg, four times per day, dose of methadone.  *See* Tr. 270, 301.

Meanwhile, Burkard also continued treatment of her mental health symptoms. On April 28, 2004 nurse practitioner Karen Grisham evaluated Burkard, finding that she was depressed

with racing thoughts, crying spells, panic attacks, daily headaches, and suicidal ideation, and that she had begun shoplifting. Tr. 270-71. In addition, Grisham noted that Burkard had gained 30 pounds in the last ten months, bringing her weight to 180 pounds. Tr. 271. In a note dated June 1, 2004 , Grisham noted that Burkard's general condition had improved, although she continued to have panic attacks, low energy, and urges to steal. Tr. 268. Her diagnosis remained bipolar disorder II. *Id.*

On June 8, 2004, Dr. Shim examined Burkard and found that she was "doing quite well in terms of fibromyalgia at this time." Tr. 301. Her methadone dose had been stable for over a year and Dr. Shim wrote her a prescription for two months of methadone, since Burkard was searching for a new primary care physician after moving near Bend, Oregon. *Id.*

On August 23, 2004, physical therapist Lori Dormarchuk evaluated Burkard for fibromyalgia. Burkard complained of "stiffness and soreness" in the cervical, pelvic, abdominal, and gluteal regions. Tr. 346. Movement, sitting for 30 minutes, and lifting her grandchildren would aggravate her symptoms. *Id.* Burkard also reported that her symptoms would increase in intensity if she deviated from "her normal routine." *Id.* After packing and moving to a new town, Burkard felt that her pelvis "needed to be aligned." *Id.* Dormarchuk assessment was that Burkard had "non-severe, moderately irritable muscular dysfunction secondary to overlying diagnosis of fibromyalgia, chronic." *Id.* Dormarchuk treated Burkard five times in August and September 2004, and then discharged her. Tr. 344.

Starting in August 2004, Burkard began seeing Dr. Derek Palmer. On March 31, 2005, Burkard reported to Dr. Palmer that she felt she had suffered a recent nervous breakdown. Tr. 416. Her moods became more depressed in bad weather and the seasons tended to have a great

impact on her.  *Id.*  She was also "bothered by diffuse body aching with fibromyalgia" such that "she feels she is unable to work." *Id.*  In an April 16, 2005 visit, Burkard complained of neck and back spasms and urinary incontinence.  Tr. 415.  On July 5, 2005, Burkard reported worsened leg pain after she "overdid it" packing and moving into a new house.  Tr. 414.  She asked for an increase in her narcotic prescription, but Dr. Palmer told her that "as a general rule this was not a good idea" and kept her on the same regimen, instead prescribing a muscle relaxant.  *Id.*  Although her muscle pain had not improved, Burkard reported an improvement in her depression symptoms with her switch to a new medication, Duloxetine.  *Id.*  By September 29, 2005, however, Burkard's depression had worsened and she reported feeling much better on her previous medication, Fluoxetine.  Tr. 413.  Dr. Palmer resumed that medication.  *Id.*  Burkard was also "distraught at the weight she is at currently" and discussed various diets and weight-loss techniques at length with Dr. Palmer.  *Id.*  On October 31, 2005, Burkard's depression had improved and her fibromyalgia was apparently stable. Tr. 412.  However, Burkard discussed her neck pain, which Dr. Palmer described as "one of her chief complaint [sic]" and the primary reason for her chronic narcotic prescription.  *Id.*  Dr. Palmer therefore referred her for an evaluation with Dr. Yundt.  *Id.*

Dr. Yundt reported that Burkard had a 20-year history of neck pain resulting from a motor vehicle accident and currently experienced numbness in her arms and daily headaches.  Tr. 334-335.  Burkard had "tried multiple forms of conservative therapy without any lasting benefit," including trigger point injections, chiropractic manipulation, and physical therapy." *Id.*  Dr. Yundt ordered an MRI and SPECT scan of Burkard's cervical spine, which revealed "[r]elatively advanced disc degeneration with spondylosis at C5-6 and C6-7 result[ing] in a degenerative

Page 12 - FINDINGS AND RECOMMENDATION

kyphosis," Tr. 337, and suspected degenerative arthrosis in the mid thoracic spine, Tr. 338,

among other findings.  Consequently, Dr. Yundt diagnosed Burkard with cervical degenerative

spondylosis at C5-6, Tr. 333, and provided steroid injections for Burkard's neck.  Tr. 332, 336.

The injections, however, made Burkard feel worse, and she elected a referral to rehabilitation

specialist instead of additional injections.  Tr. 332.

By January, 31, 2006, Burkard's depression had worsened, despite being on the

maximum dose of Fluoxetine.  Tr. 411.  Dr. Palmer prescribed an additional medication,

Buproprion.  *Id.*  On March 2, 2006, Burkard told Dr. Palmer that she could not afford the new

medication.  Tr. 410.   Dr. Palmer also referred Burkard again to physical therapy to address her

neck pain and the additional negative effects of Dr. Yundt's injections.  *Id.*  On March, 29, 2006,

the physical therapist, Lori Domarchuk, evaluated Burkard.  Tr. 343.  Burkard reported pain in

her skull, jaw, and trapezius muscles, and numbness and tingling in her hands and feet.  *Id.*

Based on her evaluation,  Domarchuk opined that Burkard's rehabilitation potential was "poor,"

that her "disability was stable," and that she expected "ongoing symptoms and restricted

function."  Tr. 343.  After five therapy sessions, Domarchuk discharged Burkard and encouraged

her to continue exercises and traction at home.  Tr. 340.

Between June and October 2006, Burkard sought treatment from Dr. Palmer several more

times.  Because of Burkard's inability to pay for one depression medication, Duloxetine, Dr.

Palmer substituted another medication, Mirtazapine.  Tr. 409.  Burkard, however, voiced concern

about gaining weight from Mirtazapine.  *Id.*  Burkard also reported that Mirtazapine caused

swelling and dizziness.  Tr. 408.  After Burkard stopped taking Mirtazapine, she became suicidal,

and Dr. Palmer convinced her to restart that medication, despite the accompanying weight gain.

Page 13 - FINDINGS AND RECOMMENDATION

Tr. 406. Burkard's suicidal symptoms subsided, but Burkard again stopped Mirtazapine, after gaining eight pounds and reporting that "her husband hounds her when she begins to gain weight." Tr. 405. In a letter related to Burkard's disability benefits application, Dr. Palmer described Burkard's medical condition and prognosis. He wrote that Burkard's "chief disabling condition is her severe depression," but that she "also has severe neck and back pain." Tr. 407. Consequently, Dr. Palmer wrote that "it seems unlikely that she would be able to sit or stand for an 8-hour day," although he acknowledged that this prediction "has not been objectively tested." *Id.* Dr. Palmer added that "[e]ven if she were able to work part time, her severe depression would prevent her from being meaningfully employed." *Id.* In a second letter, Dr. Palmer noted that Burkard's depression has been an "outstanding problem and is unlikely to be 100% responsive to therapy." Tr. 401. Morever, he wrote that Burkard's "severe neck and back pain" caused her to have "a decreased capacity for sitting and standing." *Id.* Dr. Palmer continued to treat Burkard for her mental issues, sleep apnea, anxiety, insomnia, neck pain, and weight gain through 2007. Tr. 385, 387-88, 390, 392, 394, 396.

In September 2006, Burkard again started counseling with Leanne Latterell, a licensed clinical social worker, and continued treatment until at least October 2007. Tr. 519 - 539. Latterell also referred Burkard to Linnea Huson, a licensed professional counselor with a speciality in Dialectical Behavioral Therapy (DBT), who Latterell though would be helpful for Burkard. Tr. 522. Huson first saw Burkard on September 29, 2007, and recommended intensive outpatient treatment in the DBT model. Tr. 516. Burkard met with Huson three times, but discontinued treatment based on concerns about money and the high level of commitment required by Huson's recommended approach. *Id.*

Page 14 - FINDINGS AND RECOMMENDATION

In June 2007, Dr. Palmer referred Burkard to Dr. Kelly Conrad, a sleep specialist.  Tr. 442.  In his initial examination, Dr. Conrad stated wrote that Burkard "had pressure tenderness in both in [sic] the upper back and lower back, as well as anterior chest" and stated that "I suspect most of this, if put together, would meet criteria for fibromyalgia."  Tr. 447.   Burkard underwent a diagnostic sleep study on July 18, 2007, which revealed evidence of severe obstructive sleep apnea.  Tr. 439.

Burkard continued frequent treatment with Dr. Palmer from late 2007 until June 2008, focusing on depression, fibromyalgia, diabetes, neck pain, obesity, and other ailments.  For example, on May 22, 2008, Dr. Palmer noted that Burkard's depression had grown worse.  Tr. 451.  At the same appointment, Burkard's weight was 206 pounds.  On June 4, 2008, Dr. Palmer summarized his more than four-year treatment of Burkard in a letter to the Disability Determination Services.  Tr. 450.  Dr. Palmer wrote that Burkard "has maintained nearly from the start of our relationship that she is unable to work." *Id.*  Dr. Palmer noted that Burkard's depression "made it difficult for her to concentrate and do any form of mental work" and that Burkard was also "hampered by diffuse spine and muscular pain."  *Id.*  Although Dr. Palmer had not done any "formal testing on her ability to lift, carry, walk, etc.," he was "confident that her ability to perform these tasks would be severely hampered." *Id.*  Dr. Palmer concluded by stating that "we have been unsuccessful in returning her to a state in which she would be capable of gainful employment." *Id.*

On October 17, 2008, in anticipation of Burkard's hearing with the ALJ, Dr. Palmer again summarized Burkard's medical condition as it pertained to her capacity for employment.  Tr.

Page 15 - FINDINGS AND RECOMMENDATION

486.  Dr. Palmer wrote that Burkard's three primary diagnoses, fibromyalgia, depression, and

generalized anxiety disorder, "have no objective tests or findings other than the patient's

self–reporting of symptoms." *Id.*  Nevertheless, Dr. Palmer noted that Burkard reported being

unable to lift even 10 pounds and being unable to concentrate due to the depression.  *Id.*  Dr.

Palmer admitted that "attempts to manage Ms. Burkard's conditions has [sic] been hampered by

a fear of medication side-effects, especially weight gain . . . ."  *Id.*  In conclusion, Dr. Palmer

stated that he was "fairly pessimistic that [Burkard] will be able to achieve freedom from anxiety,

depression and pain to a degree that will permit her to be independent again." *Id.*

Burkard also contacted licensed professional counselor Linnea Huson in October, 2008,

who noted that Burkard's reported symptoms and recommended treatment remained unchanged

since the fall of 2007.  Tr. 516.  Huson noted that "[o]vercoming a chronic mood disorder which

is exacerbated by personality problems is a difficult challenge" and gave Burkard a poor

prognosis, stating that Burkard's "current support systems appear inadequate, health issues are

chronic and finances seem to be a constant struggle."  *Id.*  Although Huson could not speak to the

impact of Burkard's physical ailments on her ability to work, Huson stated that she "would not

recommend her working part or full time for at least the next year" because Burkard would need

"all available energy to work the treatment program I have set forth," a structured, intensive

outpatient treatment program.  Tr. 517.

## II.    State Agency Medical Assessments

In the days before Burkard's initial disability determination, non-examining state agency

medical consultants expressed views of Burkard's condition that contrasted with those of her

treating physician and Burkard's own reports.  On August 8, 2006, Dr. Mary Ann Westfall reviewed Burkard's medical records dating back from February 2002 through March 2006 and opined that Burkard's "[a]llegations are less than fully credible, greatly exceed objective findings and are so exaggerated that they do not provide any realistic picture of functioning."  Tr. 355.  Consequently, Dr. Westfall found Burkard had a physical residual functional capacity such that Burkard could lift and/or carry 20 pounds occasionally and 10 pounds frequently; sit, stand, and/or walk about six hours in an eight hour workday; push and/or pull, with occasional operation of overhead levers and controls; and perform all postural movements frequently, with the exception of climbing ladders, ropes, and scaffolds.  Tr. 349-350.

On August 9, 2006, Robert Henry, Ph.D. also reviewed Burkard's medical records dating from February 2002 through March 2006.  He found that Burkard had medically determinable impairments consisting of depressive disorder NOS and anxiety disorder NOS.  Tr. 360-361.  Dr. Henry noted that Burkard's two most serious episodes of mental health complaints occurred "in the context of trying to obtain disability" and that Burkard "has not followed up with both counseling and [prescriptions] at times due to cost and yet has not decompensated or shown significant [symptoms] at any exams."  Tr. 368.  Dr. Henry also acknowledged that Burkard's depression appeared to be longstanding and significant, but noted that "evidence does not support that it is disabling."  *Id.*  Thus, Dr. Henry opined that Burkard had "poor credibility" and concluded that she "is capable of simple work with limited contact with the general public and moderate restriction on working in conjunction with others."  *Id.*

Two different state agency medical consultants reached similar conclusions in support of

Page 17 - FINDINGS AND RECOMMENDATION

the reconsideration of Burkard's claim.  In a physical summary from January 16, 2007, Dr. Linda

Jensen noted that Burkard's self-reports of her activities and impairments were "not fully

consistent w[ith] the totality of evidence."  Tr. 379.  For instance, Dr. Jensen stated that Burkard

reported that she cares daily for her disabled daughter, shops for her, and manages her money,

and does household chores, including 30 minutes of ironing, two hours of laundry, and four

hours of cleaning daily.[3]  *Id.*  By contrast, however, Burkard also reported that she was unable to

sit or stand for any length of time, which Dr. Jensen concluded was "not consistent w[ith] the

activity noted in [activities of daily living]."  *Id.*  Also,  Dr. Jensen observed that Burkard

"reports that she is not able to handle her own finances, but reports she handles the finances for

her disabled daughter."  *Id.*  Dr. Jensen also gave only "partial decisional weight" to the opinions

of Burkard's treating physician, Dr. Palmer.  *Id.*  Although Dr. Palmer opined that Burkard's

severe depression prevents her from engaging in meaningful employment,  Dr. Jensen noted that

Palmer "does not address the problem w[ith] [Burkard] not following recommended

---

[3] Dr. Jensen's account of Burkard's activities, however,  does not appear to be an accurate summary of the evidence.  In her function report, Burkard responded to a question asking her to list household chores that she was able to do.  Tr. 148.  Burkard wrote: "I can only do a job a day. I am in pain no matter what I do so I paste [sic] myself. Some jobs if done to [sic] long make me hurt worst [sic]."  *Id.*  In response to the next question, which asked how much time it took Burkard to do each of these chores and how often she did them, Burkard wrote: "Ironing I spend 1/2 hour, laundry 2 hours, cleaning at slow paste [sic] 4 hrs all day."  *Id.*  Taken together, these responses indicate that Burkard completes only one household task per day at a slow pace, not that Burkard performs a half hour of ironing, two hours of laundry, and four hours of cleaning *daily*.  Burkard's account of her daily routine in the same questionnaire confirms Dr. Jensen's mistake.  Burkard writes: "I get up take my meds use my heating pad or ice pack on my neck and shoulders, sometimes hips. Then I'll eat breakfast make any phone calls that need to be made, than [sic] do light house work get dressed.  By that time I take a nap get up do dinner, dishes, watch T.V. do stretching exercises."  Tr. 146.  Burkard's daily routine includes "light housework" in between breakfast and getting dressed, not six and half hours of household chores, as Dr. Jensen describes.

Page 18 - FINDINGS AND RECOMMENDATION

[prescription] therapy, and how that reflects on the unsuccessful medication trials." *Id.* Additionally, Dr. Jensen noted the discrepancy between Burkard's reports to Dr. Palmer that she is limited in her ability to sit and stand for any length of time and Burkard's self-report that she completes daily household tasks and helps her disabled daughter.  *Id.*  Consequently, Dr. Jensen found that the "physical evidence continues to support" the physical residual functional capacity completed for the initial adjudication.  *Id.*

Another state agency consultant, Paul Rethinger, Ph.D., authored a very similar report on the same date, January 16, 2007.  That report listed similar background information to Dr. Jensen's report, included updates on Burkard's mental health treatment since her initial denial, and repeated, word-for-word, Dr. Jensen's conclusions about inconsistencies undermining Dr. Palmer's opinions.  Dr. Rethinger's only additional comment was as follows: "Dr. Palmer opines depression disabling yet said he had consulted with [Burkard] by telephone, not in person. His opinion is not bolstered by any objetive [sic] evidence and is given little weight."  Tr. 378.

## III.    Hearing Testimony and Submissions

At her hearing on November 3, 2008, Burkard testified about her medical condition. Burkard said she had pain in her entire body, but that her neck, hips, arms, hand and knees particularly hurt. Tr. 49.  For example, Burkard reported difficulty blow-drying her hair due to pain in her arms and neck, Tr. 48, and stated that she had fallen quite a few times on stairs because her knee would lock up.  Tr. 49.  Burkard described taking numerous medications for her physical symptoms, including methadone, Vicodin, and Soma, a muscle relaxant.  Tr. 50.  Side effects of those medications included dizziness, lack of concentration, and acid reflux.  Tr. 51.

Burkard also discussed her depression. She testified that she was depressed every day, Tr. 52, to the extent that she avoids getting dressed unless she has to go out of the house. Tr. 52. Burkard estimated that she could sit for only 30 minutes at a time before getting up and moving around, and explained that she does stretches for her neck all day to prevent migraines. Tr. 53. Burkard's concentration deficits require her to "read things over and over again in order to understand them." *Id.* Further, Burkard's concentration problems make driving difficult. Tr. 54. Although Burkard has done occupational training, she could only do household chores like laundry and vacuuming for five minutes at a time. Tr. 54-55.

Leo Burkard, Lucretia Burkard's husband, also testified about Burkard's condition. He noted that prolonged standing, sitting, focusing, and staying on task is extremely difficult for Burkard. Tr. 59. In a questionnaire about Burkard's condition, Leo Burkard also stated that Burkard is so fatigued that if she leaves the house she must take a nap to recover. Tr. 138. He noted that Burkard can only complete one chore per day, such as laundry or bathing and that vacuuming is particularly hard. Tr. 140. He also stated that Burkard's neck, shoulders, hips, knees and feet hurt Burkard when she walks. Tr. 141. He estimated Burkard could walk for 25 to 30 minutes on level ground on a good day, but sometimes is able to walk only five to 10 minutes or not at all. Tr. 143. He also noted that stress is very difficult for Burkard to deal with and that she is fearful of driving or being around groups of people. Tr. 144. Overall, he explained Burkard "no longer has the motivation for many activities as the resulting pain from doing them is not worth it."

Nancy Bloom, a vocational expert (VE) also testified at the hearing. The ALJ asked the VE to consider an individual limited to light work, able to occasionally climb ropes, ladders, or

scaffolds, limited to occasional overhead reaching with either arm, limited to remembering, understanding, and carrying out short and simple, but not detailed or complex instructions or tasks, not working in close proximity or close coordination with others, limited to sporadic or intermittent brief public contact. Tr. 64-65. In response, the VE identified the feasible occupations of small product assembler, motel cleaner, and electronics worker, which existed in significant numbers in the national economy. Tr. 66.

Burkard also submitted two letters from friends containing their observations of Burkard's condition. Laura Malcolm wrote that she "has watched [Burkard] go from a vibrant, energetic woman who worked full time, gardened, canned food and enjoyed athletic recreation to a person who lives with constant chronic pain, fatigue, and depression [such] that she has difficulty most days just getting out of bed and performing routine household tasks." Tr. 164. Malcolm stated that although Burkard had occasional good days, "much of the time we spend together she physically requires frequent rest periods, pain medication that makes her mentally 'fuzzy', daily heat and massage to her neck and shoulders and frequent elevation of her feet and legs to decrease swelling and pain." Tr. 164-165. Malcolm concluded that "as I see her, I do not believe Lucretia could hold even a part time job." Tr. 165. Betty Boatman, another friend of Burkard's, wrote that during her 20 years of friendship with Burkard, "I have noticed her physical pain . . . become so severe that it has hampered her ability, at times, event to enjoy daily life routines." Tr. 185. She also stated that Burkard's depression was "so severe it is difficult at times for her to carry on a regular conversation." *Id.*

//

//

Page 21 - FINDINGS AND RECOMMENDATION

## SUMMARY OF ALJ FINDINGS

At the first step of the five-step sequential evaluation process, the Administrative Law Judge found that Burkard did not engage in substantial gainful activity at any time from her alleged disability onset date of February 28, 2002 through her date last insured of September 30, 2006. Tr. 19. He therefore proceeded to the second step of the analysis.

At the second step, the ALJ found that Burkard's medical impairments of fibromyalgia, degenerative disk disease of the cervical spine, depressive disorder NOS, and anxiety disorder NOS were "severe" for purposes of the Act. Tr. 13. Because the combination of impairments was deemed severe, the ALJ properly proceeded to the third step of the analysis.

At the third step, the ALJ found that none of Burkard's impairments was the equivalent of any of the impairments enumerated in 20 C.F.R. § 404, subpt P, app. 1. Tr. 13. The ALJ therefore properly conducted an assessment of Burkard's residual functional capacity. Specifically, the ALJ found that Burkard had the residual functional capacity to:

> lift/carry 20 pounds occasionally and 10 pounds frequently; push/pull within those weight limits; stand/walk/sit about 6 hours out of an 8 hour day; and perform all postural movements frequently except she should only occasionally climb ladders/ropes/scaffolds. Additionally, the claimant is limited to rare overhead reaching due to bilateral pain and weakness. She should be limited to 1–3 step simple tasks, only have sporadic public contact at most, and have limited exposure to coworkers and supervisors.

Tr. 14. In reaching these conclusions, the ALJ considered all symptoms and the extent to which they were consistent with objective medical evidence and other evidence, as well as opinion evidence. Tr. 15-24.

At the fourth step of the five-step process, the ALJ found in light of her RFC that Burkard was unable to perform her past relevant work. Tr. 24.

At the fifth step, the ALJ found in light of Burkard's age, education, work experience, and RFC that there were jobs existing in significant numbers in the national and local economy that she could perform.  Tr. 24-25.  Relying on the testimony of an objective vocational expert, the ALJ cited as examples of unskilled, light-exertional jobs that Burkard could perform despite the limitations listed in her RFC occupations including small product assembler (light, unskilled), motel cleaner (light, unskilled), and electrical worker (light, unskilled).  Tr. 25.  Based on the finding that Burkard could have performed jobs existing in significant numbers in the national economy, the ALJ concluded that she was not disabled as defined in the Act at any time between February 28, 2002, and September 30, 2006.  Tr. 25.

## ANALYSIS

### I.    Residual Functional Capacity

Burkard challenges the Commissioner's assessment of her residual functional capacity. Specifically, Burkard argues that the Commissioner improperly rejected Burkard's own testimony, lay witness testimony, and the opinions of her treating physician, Dr. Palmer, and of her counselor, Linnea Huson.

### A.    Burkard's Testimony

When a claimant's medical record establishes the presence of a "medically determinable impairment" that "could reasonably be expected to produce the [claimant's alleged] pain or other symptoms," the ALJ must evaluate the claimant's credibility in describing the extent of those symptoms.  20 C.F.R. § 404.1529.   In weighing a claimant's credibility, the ALJ conducts a

two-step analysis.  Under step one, the claimant "must produce objective medical evidence of an underlying impairment" or impairments that could reasonably be expected to produce some degree of symptom.  *Tommasetti v. Astrue*, 533 F.3d 1035, 1939 (9th Cir. 2008), *quoting Smolen v. Chater*, 80 F.3d 1273, 1281-82 (9th Cir. 1996).  If the claimant meets this threshold and there is no affirmative evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Id.*, *quoting Smolen*, 80 F.3d  at 1281, 1283-84.  In evaluating a claimant's credibility, the ALJ may consider, *inter alia*, the "claimant's reputation for truthfulness, inconsistencies either in claimant's testimony or between h[is] testimony and h[is] conduct, claimant's daily activities, h[is] work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which claimant complains."  *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (internal modifications omitted), *citing Light v. SSA*, 119 F.3d 789, 792 (9th Cir. 1997).  In the event the ALJ determines that the claimant's report is not credible, such determination must be made "with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony."  *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002), *citing Bunnell v. Sullivan*, 947 F.2d 341, 345-46 (9th Cir. 1991) (*en banc*).

Here, the ALJ found Burkard's testimony about her impairments and their impact on her ability to work not fully credible for two reasons.  Tr. 16, 23.  First, the ALJ found that Burkard's representation of disabling pain was not believable because it conflicted with Burkard's own description of her activities and the limitations she reported to her doctors.  *Id.*

Second, the ALJ found that Burkard's non-compliance with medications– both in seeking

increased pain medication and in discontinuing medication due to cost or side effects– suggested

that Burkard was not as debilitated as she portrayed herself.  Tr. 23.  These conclusions were not

based on substantial evidence and were contrary to law.

### 1.    Pain Testimony Conflicting with Activities and Reported Limitations

While subjective pain testimony cannot be rejected on the sole ground that it is not fully

corroborated by objective medical evidence, the medical evidence is still a relevant factor in

determining the severity of the claimant's pain and its disabling effects.  *Rollins v. Massanari*,

261 F.3d 853, 857 (9th Cir. 2001); *citing* 20 C.F.R. § 404.1529(c)(2).  An ALJ may look to

testimony of a claimant's daily activities to support a finding that subjective pain complaints are

not credible.  *Gonzalez v. Sullivan*, 914 F.2d 1197, 1201 n.2 (9th Cir. 1990).   If, despite her

claims of pain, "a claimant is able to perform household chores and other activities that involve

many of the same physical tasks as a particular type of job, it would not be farfetched for an ALJ

to conclude that the claimant's pain does not prevent the claimant from working."  *Id.*, *quoting*

*Fair v. Bowen*, 885 F.2d 597, 602 -04 (9th Cir. 1989).  Yet, "[t]he Social Security Act does not

require that claimants be utterly incapacitated to be eligible for benefits, . . . and many home

activities are not easily transferable to what may be the more grueling environment of the

workplace, where it might be impossible to periodically rest or take medication."  *Id.*  For

example, a claimant may have the capacity to travel periodically, cook meals, and wash dishes

and still be prevented from working.  *Fair*, 885 F.2d at 603.  Thus, "if a claimant is able to spend

a substantial part of his day engaged in pursuits involving the performance of physical functions

that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit an allegation of disabling excess pain." *Gonzalez*, 914 F.2d at 1201.  Therefore, Ninth Circuit precedent suggests that an ALJ may only discredit a claimant's excess pain testimony by specifically finding both that the claimant spends a substantial part of her day engaged in daily physical activities, and that those activities are of the same type that the claimant would use in a work setting.

Here, the ALJ failed to provide clear and convincing reasons to discredit Burkard's excess pain testimony because he did not make a specific finding that Burkard's daily physical activity was substantial and easily transferable to the workplace.  Although the ALJ generally noted that Burkard independently performed household chores, cooked meals at least twice a week, cared for her disabled daughter, and on one occasion packed and moved her belongings to a new house, the ALJ failed to examine whether these tasks actually amounted to sustained daily physical activity.  Tr. 16, 17, 23.

In fact, the record shows that they did not.  For example, Burkard testified that she could only vacuum for five minutes at a time and that she had to take rest breaks in a routine task like blow-drying her hair.  Tr. 54-55, 48.  Additionally, in a pain questionnaire, Burkard wrote that while cleaning house was an activity she formerly could do all morning, now she can now only engage in that activity for 20-30 minutes before having to stop.  Tr. 155, 156.  Burkard also noted that she can only do one household job per day because of her pain.  Tr. 148.  Moreover, although Burkard wrote that she prepares two dinners a week, she also stated that her typical prepared meals are cereal, soup, or sandwiches and that she spends an hour preparing such meals.

Tr. 148.  Regarding caregiving for her disabled daughter, Burkard noted that she takes her daughter to doctor's appointments, helps her pay bills and manage her money, and helps her buy clothing and food.  Tr. 147.  None of this caregiving involves substantial physical activity. Further, Burkard's pain flare-up after packing and moving into a new house is evidence of her inability to engage in substantial physical activity, not the opposite, as the ALJ suggests.

Finally, even assuming that Burkard engaged in physical activities for a substantial part of her day, the ALJ failed to provide evidence that those tasks were transferable to the workplace. Tr. 23 (ALJ's conclusory statement that "[t]hese reported activities, despite her impairments, are more consistent with an individual able to sustain at least light work than with an individual totally disabled.")[4] In this case, Burkard's daily activities are, in the words of the Ninth Circuit, "quite limited and carried out with difficulty."  *Benecke v. Barnhart*, 379 F.3d 587, 594 (9th Cir. 2004) (holding that ALJ erred in discrediting pain testimony and crediting that evidence as true). Thus, the ALJ improperly discredited Burkard's pain testimony because he made no specific finding that Burkard spends a substantial part her day doing functions involving physical activity that are transferable to a work setting.  *See Gonzalez*, 914 F.2d at 1201.

### 2.    Non-compliance with Medication

Excess pain testimony can also be also be discredited based on an unexplained, or

---

[4] Moreover, the ALJ's insinuation that Burkard be "totally disabled" in order to qualify for disability benefits is contrary to Ninth Circuit case law.  *See Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001) ("This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities . . . does not in any way detract from her credibility as to her overall disability. One does not need to be 'utterly incapacitated' in order to be disabled.") (citations omitted).

inadequately explained, failure to seek treatment or follow a prescribed course of treatment. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).   Similarly, an ALJ may infer that a claimant's pain is "not as all-disabling" as the claimant reports if the claimant fails to seek an aggressive treatment program or fails to seek an alternative treatment program after discontinuing an effective medication due to mild side effects. *Tommasetti*, 533 F.3d at 1039.   Such a failure to pursue aggressive treatment of pain may be probative of credibility "because a person's normal reaction is to seek relief from pain, and because modern medicine is often successful in providing some relief." *Orn*, 495 F.3d at 638.   An ALJ, however, may not rely on a claimant's failure to take pain medication "where evidence suggests that the claimant had a good reason for not taking medication." *Id.* at 602, *citing Gallant v. Heckler*, 753 F.2d 1450, 1455 (9th Cir. 1984).

Here, the ALJ improperly discredited Burkard's testimony on the basis of non-compliance with medications.  The ALJ erroneously conflated Burkard's pain medication and depression medication regimes, stating that Burkard "often finds prescriptive relief from her *pain*, but then stops using the medications due to cost concerns or displeasure with weight gain." Tr. 23 (emphasis added).  In fact, the record shows that Burkard was entirely compliant with her pain medications, several times requesting *increased* doses when her fibromyalgia pain worsened. Tr. 303, 414.[5]  Moreover, the ALJ reasoned that Burkard's requests for increased narcotic pain-killers detracted from her credibility.  Tr. 23.  Ninth Circuit case law, however,

---

[5]The ALJ also suggests that Burkard's request for a change in the filling schedule of her methadone prescription to accommodate a family trip is an example of Burkard's non-compliance.  The ALJ's reasoning is faulty, however, since rescheduling her prescriptions indicates a desire to continue taking them for pain relief, not a move towards less aggressive treatment.

indicates that seeking aggressive pain relief in the form of medication is a normal response to pain and suggests the such behavior makes a claimant's testimony of debilitating pain more credible, rather than less credible.  *See Orn*, 495 F.3d at 638.  Thus, the ALJ's first reason for discrediting Burkard's pain testimony is unsupported by the record and the ALJ's second reason contradicts controlling case law.

Burkard's non-compliance with her depression medications also does not furnish a basis for discrediting her testimony.   The Ninth Circuit has explained that discrediting testimony based on non-compliance with treatment makes little sense "where the stimulus to seek relief is less pronounced, and where medical treatment is very unlikely to be successful."  *Orn*, 495 F.3d at 638 (describing obesity as a such a condition and concluding that "the failure to follow treatment for obesity tells us little or nothing about a claimant's credibility").   The same reasoning applies to depression, which by its nature prevents patients from actively pursuing treatment and is difficult to control, at least in Burkard's case.

Even if failure to take depression medication potentially implicated Burkard's credibility, Burkard had several good reasons for her non-compliance in this case.  *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008) (lack of insurance coverage and suffering adverse side effects constitute good reasons for pursuing less aggressive treatment regimes).   First,  Burkard discontinued two different depression medications, Buproprion and Duloxetine, because she could not afford them.  Tr. 409, 410.  Burkard also went on and off Mirtazapine, another depression medication, because it caused her to gain weight.  Weight gain was of particular concern to Burkard; she frequently sought treatment from Dr. Palmer for obesity and

ultimately reached a weight of 206 pounds after gaining more than 50 pounds since 2003.  Tr.
271, 451.  In sum, the ALJ's decision to discredit Burkard's testimony because of her non-
compliance with medication was not based on substantial evidence and was contrary to law.

**B.     Lay Witness Testimony**

"Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take
into account, unless he or she expressly determines to disregard such testimony and gives reasons
germane to each witness for doing so." *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001).
Friends and family members in a position to observe a claimant's symptoms and daily activities
are competent to testify as to her condition.  *Dodrill v. Shalala*, 12 F.3d 915, 918–19 (9th Cir.
1993).  While a witnesses who views the claimant on a daily basis can often tell whether
someone is suffering or merely malingering, the testimony of those who see the claimant less
often still carries some weight.  *Id* at 919.  Where a lay witness statement is similar to the
claimant's own subjective complaints, however, the ALJ may reject the witness statements for
the same reasons that the ALJ discounted the claimant's testimony, as long as the ALJ properly
discredited the claimant's testimony.  *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 694
(9th Cir. 2009).

Here, the ALJ improperly rejected the testimony and submissions of three lay witnesses:
Leo Burkard, the plaintiff's husband, and Laura Malcolm and Betty Boatman, both friends of
Burkard.  The ALJ found the witnesses statements were consistent with Burkard's own reports
and testimony, but reasoned that "[s]ince the reporting of the claim is not found to be credible for
reasons noted herein, the parroting of those allegations by witnesses only slightly enhances that

reporting." Tr. 18.[6]  As described above, the ALJ erred in rejecting Burkard's testimony; thus,

the ALJ could not use the same rationale to discount the lay witness testimony.  Moreover, the

ALJ mischaracterized the witnesses statements.  Far from "parroting" Burkard's allegations, the

witnesses described independent observations of Burkard's physical condition.  *See*, *e.g.,* Tr. 164

(friend Laura Malcolm stating that she "has watched [Burkard] go from a vibrant, energetic

woman who worked full time, gardened, canned food and enjoyed athletic recreation to a person

who lives with constant chronic pain, fatigue, and depression [such] that she has difficulty most

days just getting out of bed and performing routine household tasks").  Thus, the ALJ improperly

rejected the lay witness testimony because the reason provided for rejecting that testimony was

predicated on the ALJ's erroneous rejection of Burkard's own testimony, and thus was not based

on substantial evidence.

## C.    Opinions of Treating Physicians and Non-Medical Sources

In weighing a claimant's medical evidence, the Commissioner generally affords enhanced

weight to the opinions of the claimant's treating physicians.  *See* 20 C.F.R. § 404.1527(d)(2).

Indeed, where a treating physician's medical opinion is well supported by diagnostic techniques

and is not inconsistent with other substantial evidence in the medical record, the treating

physician's opinion is accorded controlling weight.  *See id.*  Moreover, even where a treating

---

[6] The Commissioner also argues that the ALJ articulated an alternative germane reason to discredit the statements of the lay witnesses: that "the behavior observed by the witnesses is not fully consistent with the medical and other evidence of record." Tr. 18.  Because the ALJ rejected – either partially or completely–  all evidence other than that provided by the state agency medical consultants, his reasoning was at least consistent with his other findings. Nevertheless, in light of my analysis finding credible the evidence that the ALJ rejected, *supra,* the ALJ's justification no longer stands.

physician's opinion is contradicted by competent medical evidence, it is still entitled to deference

and must be weighed using all of the factors provided in 20 C.F.R. 404.1527. *Orn v. Astrue*, 495

F.3d 625, 631-632 (9th Cir. 2007). Thus, an uncontradicted treating physician's opinion may

only be rejected for "clear and convincing" reasons supported by evidence in the record, while a

contradicted treating physician's opinion may only be rejected for "specific and legitimate"

reasons supported by substantial evidence in the record. *See Reddick v. Chater*, 157 F.3d 715,

725 (9th Cir. 1998), *citing Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Rejecting a

contradicted treating physician's opinion for "specific and legitimate reasons" can be

accomplished "by setting out a detailed and thorough summary of the facts and conflicting

clinical evidence, stating [the ALJ's] interpretation thereof, and making findings." *Orn*, 495 F.3d

at 632*, quoting Reddick,* 157 F.3d at 725.

Even if there is substantial evidence in the record contradicting the opinion of the treating

physician, the treating physician's opinion is not rejected outright; rather, that opinion is no

longer entitled to "controlling weight." *Orn*, 495 F.3d at 632; 20 C.F.R. § 404.1527(d)(2); *see*

S.S.R. No. 96-2p at 1 ("A finding that a treating source's medical opinion is not entitled to

controlling weight does not mean that the opinion is rejected.") In that event, the ALJ is

instructed by § 404.1527(d)(2) to consider the factors listed in § 404.1527(d)(2)-(6) in

determining what weight to accord the opinion of the treating physician. *Id.* Failure to consider

these factors constitutes an "independent reason preclud[ing] the ALJ from disregarding the

opinions" of a treating physician. *Orn*, 495 F.3d at 633.

### 1.    Opinions of Treating Physician Dr. Palmer

Page 32 - FINDINGS AND RECOMMENDATION

As a threshold matter, I note that several state agency physicians and psychologists contradicted Dr. Palmer's opinion that Burkard was unable to work.  *See* Tr.  355 (Dr. Westfall); Tr. 379 (Dr. Jensen); Tr. 360-361 (Robert Henry, Ph.D.); Tr. 378 (Paul Rethinger, Ph.D.) Therefore, the ALJ must not deprive Dr. Palmer's opinion of controlling weight unless he provides "specific and legitimate reasons" supported by substantial evidence in the record. Moreover, even if the ALJ provides those specific and legitimate reasons, the ALJ must also consider the factors listed in § 404.1527(d)(2)-(6) to determine what weight to accord the Dr. Palmer's opinion.  Here, the ALJ both failed to provide specific and legitimate reasons to discredit Dr. Palmer and failed to consider the appropriate factors in weighing Dr. Palmer's opinion.

### a.    Failure to Provide Specific and Legitimate Reasons

The ALJ improperly rejected the letters submitted by Dr. Palmer, Burkard's treating physician because he failed to provide specific and legitimate reasons supported by substantial evidence for their rejection.  *See* Tr. 23.   As described in his decision, the ALJ "gave only minimal weight" to Dr. Palmer's opinion for two reasons.  First, the ALJ found that Dr. Palmer's opinion "relied heavily on [Burkard's] self-reports, which as detailed throughout were unreliable . . . ." Tr. 23.  Second, the ALJ rejected Dr. Palmer's opinions because "Dr. Palmer failed to perform objective tests to confirm his diagnosis . . . ." *Id.*   Neither of these explanations constitute specific and legitimate reasons supported by substantial evidence.  Moreover, the ALJ completely failed to address Dr. Palmer's opinions concerning Burkard's depression and anxiety disorder.

Page 33 - FINDINGS AND RECOMMENDATION

### (1)    Opinions Based on Patient Self-report

An ALJ may reject a treating physician's opinion if it is based "to a large extent" on a claimant's self-reports that have been properly discounted as incredible. *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008), *citing Morgan v. Comm'r Soc. Sec. Admin.*, 169 F.3d 595, 602 (9th Cir. 1999). Here, however, as described above, Burkard's testimony was improperly discredited. The ALJ therefore erred in rejecting Dr. Palmer's opinion on the basis that Dr. Palmer's assessment relied on Burkard's own self-reported symptoms.

### (2)    Lack of Objective Evidence for Fibromyalgia Diagnosis

The ALJ also disregarded Dr. Palmer's opinions in part because Dr. Palmer lacked an objective basis for his diagnosis of fibromyalgia. In his decision, the ALJ noted that fibromyalgia is most commonly diagnosed by testing an individual's response to tender point pressure. Tr. 23. If the individual returns a positive finding of at least 11 out of 18 tender points, then the individual likely suffers from fibromyalgia. *Id.* The ALJ noted, however, that "[t]here is no medical evidence of record showing that the claimaint had this test performed, or if she did, what the results were." *Id.* Burkard contends that because fibromyalgia is difficult to measure objectively, lack of an objective diagnosis is not substantial evidence permitting an ALJ to reject the opinion of a treating physician. Burkard also argues that, in this case, Burkard's previous doctors had objectively diagnosed fibromyalgia using the trigger point test described by the ALJ. The Commissioner responds that the objective evidence of fibromyalgia in the record is immaterial because Dr. Palmer did not rely on that evidence in making his diagnosis.

In discussing diagnoses of fibromyalgia in similar cases, the Ninth Circuit has clarified

that objective evidence is not required to credit a treating physician's diagnosis of fibromyalgia.

*See Benecke v. Barnhart*, 379 F.3d 587, 594 (9th Cir. 2004). In *Benecke*, the Court affirmed the

district court's holding that the ALJ improperly the evaluations of the plaintiff's treating

physicians:

> The ALJ erred by "effectively requiring 'objective' evidence for a disease that
> eludes such measurement." *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir.
> 2003) (reversing and remanding for an award of benefits where the claimant was
> disabled by fibromyalgia). Every rheumatologist who treated Benecke (Doctors
> Harris, Pace, and Gluck) diagnosed her with fibromyalgia.[footnote omitted]
> Benecke consistently reported severe fibromyalgia symptoms both before and
> after diagnosis, and much of her medical record substantially pre-dates her
> disability application. Sheer disbelief is no substitute for substantial evidence.

*Id.* Thus, the Ninth Circuit indicates that lack of an objective diagnosis of the disease does not

constitute substantial evidence to disregard a treating physician when treating medical

professionals concur in diagnosing fibromyalgia and the patient consistently reports fibromyalgia

symptoms both before and after applying for disability benefits.

The ALJ failed to follow the Ninth Circuit's approach in Burkard's case. The record

before the ALJ indicated that since as early as 2002, nearly every medical professional treating

Burkard– mental health providers, physical therapists, and physicians of various sorts–

mentioned fibromyalgia as one of Burkard's medical conditions. Tr. 295 (Karen Grisham, nurse

practitioner); Tr. 318 (Dr. Shim); Tr. 346 (Lori Dormarchuk, physical therapist); Tr. 416 (Dr.

Palmer); Tr. 447 (Dr. Conrad). Moreover, Burkard consistently reported fibromyalgia symptoms

to treating professionals from the alleged onset of her disability forward, much of it before her

application for disability benefits in 2006. Finally, even though objective diagnostic evidence is

clearly not required for an ALJ to credit a treating physician's opinions, some objective evidence

of tender fibromyalgia trigger point was present in the record before the ALJ.  Tr. 306 (June 2003

examination by Dr. Shim finding "palpation of trigger points are mostly tender in the mid-

trapezius region").  Overall, the ALJ's "[s]heer disbelief," *Benecke*, 379 F.3d at 594,  about

Burkard's fibromyalgia diagnosis was an insufficient ground to reject Dr. Palmer's opinions.[7]

### (3)   Failure to Address Opinions Concerning Depression

Finally, the ALJ provided no "specific and legitimate" reasons supported by substantial

evidence in the record to reject Dr. Palmer's assessment of Burkard's depression and its impacts

on her ability to work.  To the extent that the ALJ relied on his conclusion that Dr. Palmer's

opinions concerning Burkard's depression were unreliable because they were predicated on

Burkard's self-reported symptoms, the ALJ was in error, as I described above.  Without any other

explanation in the record for rejecting Dr. Palmer's conclusion that depression was the most

disabling of Burkard's impairments, Tr. 19,  I must conclude that the ALJ's decision was not

based on substantial evidence in this regard.

### b.   Failure to Analyze Factors to Determine Weight of Opinion

Even had the ALJ properly denied controlling weight to Dr. Palmer's opinions, the ALJ

independently erred in failing to analyze what weight should have been given to Dr. Palmer's

---

[7] I also note that this faulty rationale for rejecting Dr. Palmer's opinion does not even apply to Dr. Palmer's assessment of Burkard's limitations from depression.  The ALJ never asserted that Dr. Palmer's depression diagnosis lacked objective substantiation.  Thus, to the extent that the ALJ rejected Dr. Palmer's assessment that Burkard's "severe depression would prevent her from being meaningfully employed," Tr. 407, the ALJ could only have done so properly for other reasons.

assessments.  In fact, several of the factors listed in 20 C.F.R. § 404.1527 would have likely

increased the weight afforded to Dr. Palmer's opinions.  For example, the length of the treatment

relationship and the frequency of examination, as well the nature and extent of physician's

relationship with the patient, reflect the weight given to an physician's opinion.  20 C.F.R. §

404.1527(d)(2)(i)-(ii). *Orn*, 495 F.3d at 633.  At the points that Dr. Palmer wrote the letters in

question, Dr. Palmer had been Burkard's primary care physician several years, encompassing

numerous visits and examinations.  Tr. 406 (two years); Tr. 450 (nearly four years); Tr. 486 (over

four years).  Dr. Palmer saw Burkard frequently between March and October 2005, tracking her

fluctuating levels of chronic pain and struggling to find an appropriate methadone dose to

manage that pain.  Similarly, during the period from June through October 2006, Dr. Palmer was

intimately involved in treating Burkard's depression with a series of different medications.

Morever, the consistency of Dr. Palmer's reports merit additional weight.  *See* 20 C.F.R. § §

404.1527(d)(4);  *Orn*, 495 F.3d at 634.  Thus, at least several factors suggest Dr. Palmer's

opinions should have been given more than minimal weight.  The ALJ's failure to weigh any

factors from 20 C.F.R. 404.1527(d)(2)-(6) was contrary to law.  *See Orn*, 495 F.3d at 632.

### 2.    Opinion of Treating Counselor Linnea Huson

Burkard argues that the ALJ improperly rejected the opinion of Linnea Huson, a licensed

personal counselor, and failed to provide any reason for accepting instead the opinions of non-

examining state agency psychologists, Dr. Henry and Dr. Rethinger.  The Commissioner

responds that the ALJ properly rejected Huson's opinion, which was irrelevant because it related

to a time period after Burkard's insured status had expired, and properly credited the opinions of the state agency psychologists after a thorough discussion of the medical evidence.

Mental health counselors are considered to be "other sources" under the regulations, as opposed to "acceptable medical sources" that reflect judgments about the nature and severity of a claimant's impairments.  20 C.F.R. § 404.1513(a), (d); S.S.R. No. 06-03p, *available at* 2006 WL 2329939, at *2.   Nevertheless, an ALJ must consider all relevant evidence, including opinions of "other sources."   S.S.R. No. 06-03p at *2, *6.  Information from "other sources" cannot establish the existence of a medically determinable impairment, but it "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."  *Id.* Moreover, the ALJ  "generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the [ALJ's] reasoning, when such opinions may have an effect on the outcome of the case."  *Id.* at *6.

First, I am not persuaded by the Commissioner's argument that the ALJ properly rejected Huson's opinion on the ground that Huson's opinion did not relate to the relevant period.  I review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely.  *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007), *citing Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003).  Here, the ALJ nowhere stated in his decision that he disregarded Huson's opinion because her examinations of Burkard occurred after Burkard's date last insured.  Therefore, I cannot affirm the ALJ on the ground

proposed only later in briefing by the Commissioner.

Even if the ALJ had relied on the date of Huson's treatment to disregard her opinion, he still would have erred. The Ninth Circuit recognizes that "reports containing observations made after the period for disability are relevant to assess the claimant's disability" and should not be disregarded solely because they originated after a claimant's date last insured. *Smith v. Bowen*, 849 F.2d 1222, 1225–26 (9th Cir. 1988) (citing authority in the Eighth, Eleventh, Fourth, Second and Seventh Circuits supporting the proposition that medical evaluations made after the expiration of a claimant's insured status are relevant to an evaluation of the pre-expiration condition); *but see Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1224 (9th Cir. 2010) (ALJ did not err in disregarding an opinion of a social worker, treated as an "other source," in part because the social worker's opinion was given two years after claimant's date last insured). Here, Huson directly commented on the long-standing nature of Burkard's mood disorder, her difficulty in overcoming it, and advised Burkard to focus her energy on treatment instead of work. Tr. 516-517. Thus, Huson's opinion was probative of Burkard's condition and thus significant to the ALJ's determination of Burkard's disability claim. Consequently, the ALJ was not excused from explaining why he rejected it. *Vincent v. Heckler*, 739 F.2d 1393, 1394–95 (9th Cir. 1984) (ALJ need not discuss all evidence presented, but must explain why "significant probative evidence has been rejected").

Further, the ALJ also failed to discuss the appropriate degree of weight that should be given to Huson's opinion evidence in a manner allowing a subsequent reviewer to follow his

reasoning as required by Social Security Ruling 06-3p.   The ALJ need not recite "magic words" to reject an opinion, and the reviewing court will draw specific and legitimate inferences from the ALJ's opinion, "if those inferences are there to be drawn." *Magallanes v. Bowen*, 881 F.2d 747, 755 (9th Cir. 1989) (where two medical opinions differed on claimant's date of disability, ALJ did not err when he "summarized the facts and the conflicting clinical evidence in a detailed and thorough fashion, stating his interpretation and making findings," even though he did not explicitly reject one doctor's opinion regarding the onset date of disability).   Here, however, the ALJ merely summarized Huson's opinion, Tr. 21-22, as well as the opinions of the two state psychologists, Tr. 22, before concluding generally that "the opinions of the State agency medical and psychological consultants should be given significant weight because they are consistent with the record as a whole." Tr. 23.   Unlike in *Magallanes*, where the ALJ addressed the specific issue upon which the doctors disagreed, here the ALJ's decision embraces the state psychologists' opinions so broadly that it prevents a reviewing court from drawing any inferences about Huson's conflicting opinion, other than that Huson's assessment must not have been as "consistent with the record as a whole" as the state psychologists'.   Therefore, the ALJ's decision to reject Huson's opinions without providing any explanation is contrary to law.

### D.    Opinions of Non-Treating, Non-Examining Physicians and Psychologists

Although not raised by Burkard in briefing, I also feel compelled to address the ALJ's improper decision to credit the opinions of state agency non-examining physicians and psychologists.  *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007), *citing Robbins v. Soc. Sec.*

*Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) ( "a reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence") (internal quotations omitted).  Regulations require that an ALJ weigh all medical opinions.  20 C.F.R. § 404.1527(d) ("Regardless of its source, we will evaluate every medical opinion we receive.  Unless we give a treating source's opinion controlling weight . . . , we consider all of the following factors in deciding the weight we give to any medical opinion.")

Although the ALJ ostensibly weighed the evidence of the state agency medical and psychological consultants, in fact, his evaluation apparently amounted to little more than improperly rejecting all other evidence contrary to the consultants' opinions.  First, the ALJ erroneously rejected Burkard's own testimony, as described above.  Then, he improperly dismissed evidence provided by lay witnesses because it "parroted" Burkard's descriptions.  Next, he discredited the opinions of Burkard's treating physician Dr. Palmer, again erroneously, because those opinions were based on Burkard's subjective reports and were unconfirmed by objective diagnostic evidence.  After disregarding nearly all of the evidence in the record, the ALJ addressed the state agency medical and psychological opinions, which he found should be given "significant weight" because they were "consistent with the record as a whole."  Tr. 23. This logic, however, is circular.  That the consultants' opinions were consistent with "the record as a whole" cannot constitute substantial evidence of their veracity, since they were the only remaining medical evidence not rejected by the ALJ.   Thus, the ALJ apparently gave significant weight to the consultants' opinions not because they were corroborated by other evidence in the

record or were inherently persuasive, but because they were the only evidence the ALJ decided to credit.

The ALJ also failed to perform even the most basic evaluation of the state agency opinions, thereby ignoring the regulations regarding such opinions. First, the regulations generally instruct the ALJ to give less weight to non-examining sources. 20 C.F.R. § 404.1527(d)(1) ("Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.") Here, none of the state agency consultants actually examined Burkard in person. Tr. 22 (Dr. Westfall, Dr. Jensen, Dr. Henry, and Dr. Rethinger reviewed "the medical evidence of record"). On that basis alone, the regulations suggest the state agency consultant opinions should be given less weight.

Further, the regulations require evaluation of the underlying basis for the non-examining opinion. 20 C.F.R. § 404.1527(d)(3) ("Supportability. . . . Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.") Although the ALJ summarized the bases for the consultants' opinions, the ALJ failed to perform the crucial analytical step of determining whether the record actually supported their explanations. For example, the ALJ credited Dr. Westfall's conclusion that Burkard's allegations were less than

credible.  Tr. 22, 355.  Dr. Westfall's evidence to support that conclusion, however, is not readily

apparent.  Although Dr. Westfall found that Burkard's allegations "greatly exceeded objective

findings and are so exaggerated that they do not provide any realistic picture of functioning," Dr.

Westfall failed to identify which objective findings she relied upon.  Tr. 355.  In fact, Dr.

Westfall's brief record review omitted at least one important objective finding, Dr. Shim's June,

2003 examination of fibromyalgia trigger points.  *See* Tr. 306.

> The ALJ similarly credited Dr. Henry's mental health assessment without observing the

deficiencies in that report.  For example, Dr. Henry observed the "two episodes of biggest mental

health complaints occurred in the context of trying to obtain disability," Tr. 368, ignoring the fact

that Burkard was actively being treated for depression by Dr. Palmer for two years before first

seeking disability benefits in June 2006 and had reported a nervous breakdown to Dr. Palmer

over a year before her application, in May 2005.  Moreover, Dr. Henry asserted that Burkard had

not decompensated or shown significant symptoms despite failing to take medications, Tr. 368,

but omitted from his record review the incident in August 2006 where Burkard became suicidal

after discontinuing Mirtazapine, a depression medication.  *See* Tr. 406.  Further, Dr. Henry

copied a paragraph of Dr. Westfall's notes word-for-word, including Dr. Westfall's negative

assessment of Burkard's credibility, *compare* Tr. 355 *with* Tr. 368, then cited Burkard's "poor

credibility" in declining to perform any further evaluation.

> The ALJ also failed to examine the bases for Dr. Jensen and Dr. Rethinger's opinions,

which, upon review, also contain blatant flaws.  For example,  Dr. Jensen's assessment relies on

mischaracterizations of Burkard's questionnaire; while Burkard stated that she was unable to sit

or stand for any length of time and could only complete one household chore per day with

difficulty, Dr. Jensen mistakenly summarized Burkard's report, suggesting that Burkard

completed multiple household chores daily totaling over six hours of housework.  *Compare* Tr.

148 *with* Tr. 379.  Dr. Rethinger repeats that mischaracterization in his assessment at

reconsideration as well.  Tr. 378 ("[claimaint] reports to us she cleans for 4 hrs daily, does

laundry for 2 hrs, irons 1/2 hr, and helps her disabled daughter w/ADL's.")  Overall, the ALJ's

failure to evaluate the weight of the state agency consultants' opinions indicates that his decision

to credit those decisions was not supported by substantial evidence in the record.

Finally, the ALJ also erred in according the consultants' opinions such dominant weight

while rejecting all other medical assessments.  The reports of the non-examining state agency

consultants, which were contradicted by Burkard's treating physician, lay witnesses, and

Burkard's own testimony, cannot alone constitute substantial evidence to support the ALJ's

residual functional capacity finding.  *See Magallanes v. Bowen*, 881 F.2d 747, 752 (9th Cir.

1989) ("[a] report of a non-examining, non-treating physician should be discounted and is not

substantial evidence when contradicted by all other evidence in the record") (internal quotations

omitted).

## II.    **Vocational Hypothetical**

Burkard also challenges the validity of the hypothetical that the ALJ posed to the VE for

two reasons.  First, Burkard argues that the hypothetical improperly omitted the ALJ's own

finding that Burkard was limited to "rare" overhead reaching, instead stating that Burkard was limited to "occasional" overhead reaching.  Second, Burkard suggests that the hypothetical improperly omitted the limitations described by Dr. Palmer and the lay witnesses.  Burkard therefore implies that in the fifth step the ALJ improperly found that Burkard could performed jobs identified by the VE existing in significant numbers in the national economy.  The Commissioner contends that the ALJ's use of "rare" instead of "occasional" was harmless, and that the ALJ posed a complete hypothetical based only on properly credited testimony.

In general, "[h]ypothetical questions posed to the vocational expert must set out all the limitations and restrictions of the particular claimant." *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988).  But, it is proper for an ALJ to limit a hypothetical to only those impairments that are supported by substantial evidence in the record.  *Osenbrock v. Apfel*, 240 F.3d 1157, 1165 (9th Cir. 2001), *citing Magallanes*, 881 F.2d at 756-57.  "If the assumptions in the hypothetical are not supported by the record, the opinion of the vocational expert that claimant has a residual working capacity has no evidentiary value." *Embrey*, 849 F.2d at 422, *quoting Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984).  Nevertheless, mistakes in a VE hypothetical which are nonprejudicial to the claimant or irrelevant to the ALJ's ultimate disability conclusion are considered to constitute harmless error.  *See Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006).

Here, I find that the ALJ erred in the construction of his hypothetical because he failed to include the limitations raised by the testimony of Dr. Palmer and the lay witnesses.  I concluded above that the ALJ lacked substantial evidence to reject Dr. Palmer's opinions and the evidence provided by Leo Burkard, Laura Malcolm, and Betty Boatman.  As a result, the ALJ similarly

Page 45 - FINDINGS AND RECOMMENDATION

lacked substantial evidence to exclude the limitations described by those individuals, including, for example, the debilitating pain that Burkard experiences when performing any physical activity for a prolonged period. Thus, the hypothetical lacked evidentiary value and the ALJ's omission was not harmless, since inclusion of additional limitations surely would have altered the VE's responses. I also agree with Burkard that the ALJ's reference to a limitation of "occasional" overhead reaching in the hypothetical is not supported by substantial evidence in the record.[8] This conclusion provides another, albeit less drastic, basis for finding that the ALJ's hypothetical was unsupported by substantial evidence. I need not decide whether the ALJ's differing choice of words was harmless in light of my previous conclusion that the ALJ otherwise erred in constructing the hypothetical.

## III.    Remedy

The only remaining question is whether to remand for further administrative proceedings or simply for payment of benefits. The court may direct an award of benefits where the record has been fully developed and where further administrative proceedings would serve no useful purpose. *Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996). Where the ALJ fails to provide adequate reasons for rejecting the opinion of a treating physician, the court credits that opinion as a matter of law. *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995), *citing Hammock v. Bowen*, 879 F.2d 498, 502 (9th Cir. 1989). Similarly, where the ALJ improperly rejects the claimant's

─────────────────

[8]Dr. Westfall's physical residual functional capacity assessment, the basis for the ALJ's hypothetical, defined "occasionally" to mean "occurring from very little up to one-third of an 8-hour workday (cumulative, not continuous)." Tr. 348. Although "rare" is undefined in that document, I gather that a vocational limitation of rare overhead reaching would be inconsistent with a job requiring "occasional" overhead reaching of up to two hours and forty minutes per day.

Page 46 - FINDINGS AND RECOMMENDATION

testimony regarding her limitations, that testimony is also credited as a matter of law. *Id.* The same is true for improperly rejected lay testimony. *Schneider v. Comm'r of Soc. Sec. Admin.*, 223 F.3d 968, 976 (9th Cir. 2000).

As discussed above, the ALJ in this case rejecting medical opinions, claimant testimony, and lay testimony either contrary to law or without providing substantial evidence. Thus, I credit the evidence presented by plaintiff Lucretia Burkard, Dr. Palmer, Linnea Huson, Leo Burkard, Laura Malcolm, and Betty Boatman as a matter of law. Included in that evidence is Dr. Palmer's opinion from October 17, 2008 that Burkard was not capable of performing either sedentary or light work, that Burkard had moderate limitations in maintaining attention and concentration for extended periods, and that Burkard had moderately severe limitations in the ability to complete a normal workday without interruption from medical symptoms. Tr. 487-490. Considering the record as a whole, including the evidence the ALJ erroneously discredited, I conclude that the ALJ's residual functional capacity finding is not supported by substantial evidence. Rather, the overwhelming evidence shows that Burkard is disabled. Since the record has been fully developed and further administrative proceedings would serve no useful purpose, I find that Burkard was disabled throughout the relevant period, and reverse and remand for determination of benefits.

**CONCLUSION**

For the reasons set forth above, I recommend that the Commissioner's final decision be reversed and remanded for determination of benefits. A final judgment should be entered pursuant to sentence four of 42 U.S.C. § 405(g).

//

**SCHEDULING ORDER**

The Findings and Recommendation will be referred to a district judge.  Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

IT IS SO ORDERED.


Dated this 7th day of December, 2010.


_/s/ Paul Papak_____
Honorable Paul Papak
United States Magistrate Judge